**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**REGINA M. CLARK,**

      **Plaintiff,**        **CIVIL ACTION NO. 08-15324**

  **vs.**

                              **DISTRICT JUDGE JOHN CORBETT O'MEARA**

**COMMISSIONER OF**       **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

      **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**I.**     **RECOMMENDATION:**    This Court recommends that Defendant's Motion for Summary Judgment (docket no. 10) be GRANTED, Plaintiff's Motion for Summary Judgment (docket no. 7) be DENIED, and the instant Complaint DISMISSED.

\*\*\*

**II.**     **PROCEDURAL HISTORY:**

Plaintiff filed an application for a period of disability and Disability Insurance Benefits on November 18, 2005, alleging that she had been disabled since June 17, 2004 due to a right shoulder rotator cuff injury and injuries to both knees. (TR 56-59, 81). The Social Security Administration denied benefits. (TR 42-45). A requested *de novo* hearing was held on July 21, 2008 before Administrative Law Judge (ALJ) Larry Meuwissen who subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits because she was not under a disability at any time through the date of the ALJ's August 8, 2008 decision. (TR 20, 28, 426). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action

for judicial review. (TR 6-8). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

### III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

#### A. Plaintiff's Testimony

Plaintiff was forty-five years old at the time of the administrative hearing. (TR 431). She has a GED and attended nursing school for three months but did not finish. (TR 433). Plaintiff has past work experience as a custodian for a school district and testified that she can no longer perform that work due to impairments of her shoulder and both knees. (TR 433-34). She testified that she has been receiving workers' compensation since 2005. (TR 435).

Plaintiff is a widow with four adult children. (TR 432). Her youngest child is eighteen years old and lived at home before going to college. (TR 432). Plaintiff's husband passed away nine months prior to the hearing. (TR 432). He had been ill for approximately five months and Plaintiff provided care for him during that time. A visiting nurse also provided care once a week. (TR 433).

Plaintiff testified that she had shoulder surgeries in 2004 and 2005 and she has trouble lifting and carrying heavy items. (TR 434). She had surgery on her knees in 2005 and 2006. (TR 434). Plaintiff testified that she takes a cane with her to church or to the store, however, she did not have one at the hearing. (TR 434, 444). She takes blood pressure medication, a water pill and medication for her knee pain and takes prescription Motrin at night, but she tries not to use it every night because "it would cause other problems." (TR 435, 444).

Plaintiff testified that her right knee and left ankle swell with increased walking and standing and she has trouble bending her knees. (TR 71, 436, 442). She can walk approximately half a

block, stand for about twenty minutes before her knee buckles. She can sit for up to forty-five minutes before she needs to elevate her leg. (TR 437, 444-45). Plaintiff testified that she is not involved in any social activities except attending church. (TR 437). She testified that she does her own housework in ten or fifteen minute intervals before she sits down. (TR 438-39). Plaintiff elevates her leg waist high for swelling and approximately two days per week she wears a brace to immobilize her right leg. (TR 438-39). Plaintiff testified that the water pill helps a little with the swelling. (TR 439).

Plaintiff reported that she has trouble reaching over her head and she has right shoulder pain when she washes dishes or puts them away. (TR 71, 443). She needs assistance from her daughter to put the plates away. (TR 443). She testified that she can lift about twenty pounds, but not regularly. (TR 445). Plaintiff attended workers' compensation-related rehabilitation for her shoulder. (TR 446).

Plaintiff reported that she grocery shops for herself for approximately one hour every two weeks. (TR 73, 438). She watches television for an hour or two a day and listens to music. (TR 442). At the time of her application Plaintiff reported that she was taking Accupril for cholesterol, furosemide (Lasix) for her knees, and hydrocodone with APAP (acetaminophen), Ibuprofen, Nabumetone and Tramadol for pain. (TR 87).

Plaintiff completed a Health Status Questionnaire with Simple Shoulder Test on February 6, 2006 in which she indicated that she can carry twenty pounds at her side with her affected extremity but would have pain afterward. (TR 163-64). She also indicated that her shoulder impairment would not allow her to work full-time at her regular job. (TR 163).

**B.     Medical Record**

*1.     Right Shoulder Impairment*

3

Plaintiff sustained a work-related injury to her right shoulder in June 2004. (Docket no. 103-11). A June 17, 2004 x-ray of the shoulder was negative. (TR 111). An MRI of the right shoulder on July 17, 2004 revealed "hypertrophic degenerative changes about the acromioclavicular joint with impingement on the underlying musculotendinous junction of the supraspinatus" and a full thickness tear of the supraspinatus tendon at its insertion with approximately 1-2 cm of retraction. (TR 327). In August 2004 Mitchell Z. Pollak, M.D. performed an arthroscopy of the right shoulder with open rotator cuff repair and anterior/inferior acromioplasty. (TR 318).

On June 9, 2005 Dr. Pollak reported that following injection of Plaintiff's shoulder, she had "significant improvement in pain and her ability to function and bring the arm up and down without difficulty." (TR 298). On July 21, 2005 Dr. Pollak notified Plaintiff's employer that she should be able to return to work after she recovered from her knee surgery. Dr. Pollak reported that Plaintiff would not be able to perform over the shoulder work or lift more than twenty pounds. (TR 296). On August 4, 2005 Dr. Pollak clarified that the twenty-pound lifting restriction was applicable to the right shoulder, "therefore, she could probably lift a total of 40 lbs. utilizing both shoulders" and that the restriction on over the shoulder level work "will probably be permanent in nature." (TR 295). A November 17, 2005 MRI of the right shoulder showed "[t]hickening of the distal subscapularis and infraspinatus tendon consistent with tendinosis/tendinitis" and a supraspinatus tendon was identified up to 1-2 cm from the insertion. (TR 324).

On January 23, 2006 Steve A. Petersen, M.D., examined Plaintiff at the request of Dr. Pollak. (TR 209). He noted that Plaintiff reported her shoulder pain as rated at a 6 on a ten-scale. (TR 209). The doctor diagnosed Plaintiff with right rotator cuff tendinosis with subacromial bursitis and right glenohumeral joint arthrosis. (TR 211). The doctor noted no evidence of recurrent rotator cuff tear. (TR 211). On February 14, 2006 Dr. Petersen performed a "arthroscopic subacromial bursectomy

with debridement and biceps release with chondroplasty of her right humeral head for chronic supraspinatus tendonosis (sic) and glenohumeral joint arthrosis" of the right shoulder. (TR 133-35, 205). By April 2006 Dr. Petersen noted that Plaintiff reported her pain at most at a 4 on a scale of ten and approximate 50 percent improvement compared to her pre-operative symptoms. (TR 201). The doctor ordered that Plaintiff was to advance her activities, allowing a work hardening program to be performed. (TR 201). Plaintiff was taking Norco and was prescribed Motrin for pain. (TR 201)

Plaintiff attended physical therapy following her acromioplasty repair of the right shoulder from April 17, 2007 to June 26, 2007. (TR 308, 312, 314-16, 335). At the time of her discharge from physical therapy it was noted that Plaintiff's right shoulder reaching above the head and reaching into cabinets was 20% better and her pain was rated at a level 3-4 of a scale of 10. (TR 335). Plaintiff had achieved decreased pain and increased strength and range of motion. (TR 335). Plaintiff had made no progress with her difficulty in combing her hair. (TR 335).

On May 7, 2007 Dr. Pollak noted that Plaintiff's range of motion in the shoulder was "much better and with less discomfort." (TR 399). On June 18, 2007 Dr. Pollak noted that a Grashey's view of the shoulder showed no evidence of glenohumeral arthritis. (TR 398, 408). On December 13, 2007 Dr. Pollak noted that "[r]ight now, [Plaintiff] is not complaining too much of shoulder or knee pain. Her major problem is the left ring finger which she injured a few months ago taking care of her husband, trying to roll him over in bed." (TR 373). An October 31, 2007 x-ray of the left hand was negative. (TR 391).

### 2. *Knee and Other Impairments*

During this period, Plaintiff also complained of impairments of her knees. A December 2004 MRI of the right knee showed a "possible oblique tear, posterior horn medial meniscus extending

5

to the interior articular surface" and "[s]uspect Grade I sprain, medial collateral ligament" with Plaintiff demonstrating "rather diffuse edema in the subcutaneous fat planes about the knee" and "modest joint effusion." (TR 322). In December 2004, Dr. Pollak performed a right knee arthroscopy meniscectomy and compartment chondroplasty. (TR 114-15, 306, 309). Plaintiff attended physical therapy and in February 2005 Dr. Pollack noted that she had made progress in physical therapy but did not have 100 percent range of motion. (TR 305). Dr. Pollak noted that at that time he could not send her back to work without restrictions and Plaintiff indicated that she could not return to work with restrictions, so the doctor noted that she would "remain off work until her next visit in approximately one month." (TR 304, 305).

Dr. Pollak noted that Plaintiff's right knee was "significantly improved" on March 31, 2005, following complaints of popping and catching in the knee and swelling and small effusion earlier in March. (TR 302, 303). Lasix had reduced Plaintiff's edema. (TR 302-03). A May 2005 MRI of the left knee revealed a "[t]ear of the posterior horn of the medial meniscus" and "[p]ossible sprain of the medial collateral ligament." (TR 323, 325). On July 1, 2005 Dr. Pollak performed an arthroscopy and debridement of Plaintiff's left knee. (TR 112-13, 297). In October and November 2005 and again in June 2006 Plaintiff underwent a series of three Synvisc injections to the right knee. (TR 290-93).

In December 2005 Plaintiff complained of a fall in which she hurt her left knee. (TR 290). Plaintiff opted to treat the knee with oral medication and ice rather than aspiration and injection with corticosteriod. (TR 290). Plaintiff continued to complain of knee pain and/or buckling from May 2006 through March 2007 with some pain relief following the viscosupplementation injections. (TR 285-288).

On January 30, 2006 Dr. Pollak reported that Plaintiff continued to experience pain in her

6

knee and has "severe chondromalacia but not bad enough to warrant" a total knee arthroplasty. (TR 290). He stated that she would continue to be treated with oral nonsteroidal anti-inflammatory medicine, visco supplementation and chondral protective agents such as Glucosamine and Chondroitin. (TR 290). He also stated that he would see her for follow-up in a few months and that "[i]t does not appear that she will be going back to work." (TR 290). On April 6, 2006 Dr. William Higginbotham examined Plaintiff and the MRIs of her knees and concluded that she had degenerative changes in the knees and likely chondromalacia. (TR 168). The doctor recommended weight loss and improving quad strength to diminish her symptoms. (TR 168).

In March 2007 Plaintiff complained of bilateral knee pain and Dr. Pollak noted that an x-ray from December 8, 2006 showed a moderate degree of cartilage space and that Plaintiff had not benefitted greatly in the past from Hyaluronate injections. (TR 373, 407). He continued treating Plaintiff with oral nonsteroidal anti-inflammatories, Glucosamine and Chondroitin and topical application of Capsaicin. (TR 373).

Plaintiff treated with Geoffrey Trivax, M.D., from January 2007 through November 5, 2007 for elevated transaminases. (TR 250-81, 389-90). Evidence shows that Dr. Trivax treated Plaintiff as early as May 2003 and in March and April 2005 Dr. Trivax noted that Plaintiff reported swelling and stiffness in the knees and/or legs. (TR 228, 230, 250). A February 2007 CT of the abdomen showed "[m]ild diffuse fatty infiltration of the liver without hepatosplenomegaly, upper abdominal ascites, or acute hepatobiliary obstruction," and "[s]mall to moderate midline anterior abdominal wall/ventral/incisional hernia without acute GI obstruction." (TR 244). Alan Cutler, M.D., noted in a letter to Dr. Trivax that Plaintiff's AST and ALT remained at 91 and 75 and that he had discussed with Plaintiff alcoholic versus nonalcoholic fatty liver disease and possible NASH. (TR 282-83, 390).

### *3.     Physical Residual Function Assessments and Vocational Rehabilitation*

An agency medical consultant, Jack Kaufman, completed a Physical Residual Functional Capacity Assessment dated February 3, 2006 and concluded that Plaintiff has the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds and stand and/or walk about six hours and sit about six hours of an eight-hour workday. (TR 124-32). On May 16, 2006 Dr. Pollak completed a Medical Source Statement concerning Plaintiff's physical impairments. (TR 172-80). Dr. Pollak concluded on the form that Plaintiff had not been capable of performing sustained light work and would not be able to do so even with the option to alternate between sitting and standing during the workday. (TR 173).

In June 2006 Dr. Petersen released Plaintiff for work as of June 12, 2006 and Plaintiff participated in a vocational rehabilitation plan. (TR 400-02). Dr. Petersen restricted Plaintiff to a position within the light to medium category of work with the following limitations: Occasional lifting from floor to knees up to 40 pounds, from knees to waist up to 35 pounds, from waist to shoulders up to 30 pounds, from shoulders to overhead up to 25 pounds, occasional bilateral carrying up to ten pounds for a distance of 100 feet, right and left carrying up to ten pounds with a distance of 100 feet, occasional squatting, limited forward bending, no kneeling and providing for self-paced walking. (TR 196, 401-02).

Plaintiff attended nine of nine scheduled work hardening treatment sessions with Lori A. Irvin, OTR, CEAS. (TR 181-82). Ms. Irvin concluded that Plaintiff did not meet the critical physical demands for her prior custodian position and concluded that an appropriate position for Plaintiff would fall within the light to medium category of work. (TR 181). Plaintiff's functional ability to lift and carry weight increased between initial treatment in April 2006 and interim treatment in June 2006. (TR 182). Her grip strength weight initially increased, then decreased

during this period. (TR 182). Plaintiff's reported pain level ratings decreased from the first days of treatment to the last day of interim treatment. (TR 182).

### C.  Vocational Expert

The ALJ asked the Vocational Expert (VE) to consider an individual of Plaintiff's age, work-experience and high-school equivalent education, with a residual functional capacity ("RFC") to perform light work with a sit/stand option limited to standing for about thirty minutes at a time and sitting for forty-five minutes to one hour at a time, able to lift twenty pounds occasionally and ten pounds frequently, needing to avoid repetitive reaching over or above the shoulder, but allowing occasional reaching above the shoulder. (TR 447). The VE testified that Plaintiff could not do her past relevant work if her RFC was for light work. (TR 447). The VE testified that such an individual could perform unskilled sedentary occupations that are classified as "light because of the requirement to lift up to twenty pounds on an occasional basis, but they can actually be performed in a seated position with the option of sitting or standing." (TR 447). The jobs included inspection, sorting, packaging and hand assembly performed at bench or table areas. (TR 447). The jobs with the sit/stand option number 30,000 in the state of Michigan with one-half of the jobs in Southeast Michigan. (TR 448). The VE testified that her testimony was "somewhat inconsistent" with the Dictionary of Occupational Titles (DOT) which does not identify whether jobs are performed seated, standing and/or walking or in some combination of these. (TR 448). The VE based her testimony on her work experience and awareness of the occupations to which she had testified. (TR 448). The VE testified that the need to elevate one or both legs higher than waist height would preclude competitive employment. (TR 448-49). The VE also testified that stooping, kneeling and crouching are not an integral part of the job duties of any of the occupations to which she had testified. (TR 449).

## IV.     ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through December 31, 2009, had not engaged in substantial gainful activity since June 17, 2004 and suffered from right rotator cuff tear, status post surgical times two, subsequent rotator cuff tendinosis with subacromial bursitis and glenohumeral joint arthrosis, tear of the bilateral medial meniscus and chondromalacia status post surgical repair and obesity, all severe impairments, she does not have an impairment or combination of impairments that meets or equals the Listing of Impairments.  (TR 22-23).  The ALJ found that Plaintiff's allegations regarding her symptoms were not totally credible and although she could not perform her past work as a custodian, she has the ability to perform a limited range of light work and there are a significant number of jobs in the economy which Plaintiff can perform.  (TR 23, 27-28).  Therefore she is not suffering from a disability under the Social Security Act from June 17, 2004 through the date of the ALJ's decision.  (TR 28).

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human*

*Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B. Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) she was not presently engaged in substantial gainful employment; and

(2) she suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See* § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the

11

claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that the ALJ's credibility finding is not supported by substantial evidence, the ALJ failed to adopt a treating physician's opinion, the ALJ failed to present an accurate hypothetical question to the vocational expert and the ALJ's RFC finding is not supported by substantial evidence.

**C.     Analysis**

*1.     Whether The ALJ's Determination Of Plaintiff's Credibility Is Supported By Substantial Evidence.*

Plaintiff argues that the ALJ did not properly assess her credibility and testimony in light of the medical records.  (Docket no. 7).  Specifically, Plaintiff argues that the ALJ's determination concerning Plaintiff's activities of daily living are not supported by the record, the ALJ improperly discounted her testimony that she requires frequent rest periods and must elevate her legs due to pain and swelling and that the ALJ's statements regarding care that Plaintiff provided for her ailing husband are not supported by substantial evidence.  (Docket no. 7).

 "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531.  Credibility assessments are not insulated from judicial review.  Despite deference due, such a determination must nevertheless be supported by substantial evidence.  *Id.*  An ALJ's credibility determination must contain "specific reasons . . .

supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Furthermore, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). In addition to objective medical evidence, the ALJ considered all the evidence of record in making his credibility determination. *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

In making his credibility determination the ALJ stated that Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms was not credible. (TR 23). The ALJ pointed out that the medical evidence shows that Plaintiff's knee pain and swelling responded to periodic Synvisc injections and her swelling and edema responded well to Lasix. (TR 25, 285-88, 302-03). In December 2006 Dr. Pollak advised Plaintiff to treated "any swelling or warmth that may develop in the knee from inflammation" with a nonsteroidal anti-inflammatory medication. (TR 286). In June 2006 Plaintiff presented with no significant warmth or effusion of the knees and in October 2006 Dr. Pollak reported that Plaintiff presented with a "little" swelling and small effusion. (TR 286, 288). Dr. Pollak repeatedly noted that he wanted to hold off as long as possible on a total

knee arthroplasty. (TR 26, 286). On at least one occasion, Plaintiff opted to treat her knees with conservative measures, for example, ice and oral medication instead of aspiration and injection. (TR 290). The ALJ correctly concluded that the record does not show a medical necessity for Plaintiff elevating her legs.

The ALJ noted that in February 2005 Plaintiff made progress in physical therapy, but had less than full range of motion in her knee. (TR 305). She also progressed in her work conditioning program treatment in functional lifting and carrying, although she continued to reported bilateral knee pain with squatting and carrying. (TR 181). Plaintiff's treatment was interrupted on only one occasion with a need to elevate her feet due to edema. (TR 181). She was otherwise able to average four hours per day of work program treatment. (TR 181).

Plaintiff argues that the ALJ's statements regarding her ability to perform activities of daily living are not supported by substantial evidence and that she required frequent rest periods and needed to elevate her legs. As the ALJ correctly pointed out, Plaintiff reported being independent in basic personal care, and was able to perform some household chores including laundry and ironing. (TR 72). The ALJ also pointed out that Plaintiff was unable to complete vacuuming, grocery shopping and mopping. (TR 25). The ALJ pointed out that Plaintiff regularly attends church, which is supported by her own testimony. (TR 74, 442). Plaintiff continues to drive. (TR 73). The Court finds that the ALJ's statements with respect to Plaintiff activities of daily living is supported by substantial evidence.

The Court also finds, despite Plaintiff's allegations to the contrary, that the ALJ did not speculate about the care she provided to her ailing husband. The ALJ stated that Plaintiff provided primary care to her ailing husband, and concluded that the tasks involved were "light at best considering the claimant's injury to her finger in an attempt to move her husband in bed." (TR 27).

14

This statement is directly supported by the record. Plaintiff sought treatment for her injured finger in October and December 2007 and Dr. Pollak noted that Plaintiff had reported injuring the finger when attempting to move her husband. (TR 373, 391). "Light" work is defined as work involving lifting no more than twenty pounds at a time. 20 C.F.R. § 404.1567(b). The ALJ's assignment of "light" exertion to this task is conservative and supported by the record. The Court also notes that the ALJ did not rely solely on Plaintiff's activities of daily living and care of her ailing husband to find that her statements regarding her symptoms were not fully credible, but mentioned them as only one of several areas which support a finding that Plaintiff's statements are not fully credible. Even if this Court were to find that the ALJ's findings regarding Plaintiff's activities of daily living and care of her husband were not supported by substantial evidence, the ALJ has relied on other substantial evidence of record in making his credibility determination. Based upon the foregoing, the Court concludes that substantial evidence supports the ALJ's credibility assessment.

### 2. *Whether The ALJ Assigned Proper Weight To The Treating Physician's Opinion*

Plaintiff argues that the ALJ erred in failing to adopt Dr. Pollak's opinions. Despite Plaintiff's argument that Dr. Pollak's restrictions set forth in the Medical Source Statement are "entitled to complete deference," dispositive administrative findings relating to the determination of a disability and Plaintiff's RFC are issues reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e). The ALJ "is not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Maple v. Apfel*, 14 Fed. Appx. 525, 536 (6th Cir. 2001); *see also* 20 C.F.R. § 404.1527(e). Therefore, the ALJ did not err in failing to adopt Dr. Pollak's conclusion that Plaintiff is not capable of performing sustained work. (TR 172-73).

It is well settled, however, that the opinions and diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. § 404.1527(d)(2), the ALJ must give a

15

treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The Sixth Circuit has stated that "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters*, 127 F.3d at 529-30.

If an ALJ rejects a treating physician's opinion, he must "give good reasons" for doing so in his written opinion. *See* 20 C.F.R. 404.1527(d)(2); *see also* SSR 96-5p and 96-2p. Furthermore, the Sixth Circuit has noted that the ALJ must provide good reasons for the weight given a treating source's opinion. *Wilson v. Comm'r of Social Sec'ty*, 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (*citing* SSR 96-2p, 1996 WL 374188, at *5).

Plaintiff specifically argues that the ALJ's RFC is inconsistent with Dr. Pollak's medical documentation and Medical Source Statement dated May 16, 2006. (TR 172-80). Plaintiff argues that the ALJ ignored Dr. Pollak's opinion about the severity of her bilateral knee condition and his statement that Plaintiff "may soon require total knee arthroplasty." (TR 180).

The ALJ fully explained why he did not give controlling weight to Dr. Pollak's statements including the Medical Source Statement. (TR 26-27). The ALJ pointed out where Dr. Pollak's opinions were inconsistent with substantial evidence in the record. He showed that Dr. Pollak's May 2006 opinion reducing Plaintiff to less than sedentary work was inconsistent with his prior opinions in July 2005 which stated that she could return to work after she recovered from her knee surgery but was limited to lifting 20 pounds on the right, or forty pounds bilaterally and with likely permanent restrictions from over-the-shoulder lifting. (TR 27, 295-96). The evidence also showed

that Plaintiff made improvements in physical therapy and vocational rehabilitation and had improvements in range of motion of her shoulder. (TR 399). The ALJ pointed out that the May 2006 opinion was inconsistent with evidence from the same period in which Dr. Petersen, also a physician with a history of treating Plaintiff, released Plaintiff for participation in a vocational rehabilitation program, assigned restrictions between the light and medium range of exertion, as set forth in detail above, and the actual records of the vocational rehabilitation program supported less restrictive exertional limitations than those set forth by Dr. Pollak. (TR 181-82, 400-02).

With respect to Dr. Pollak's statement that Plaintiff "*may soon* require total knee arthroplasty," the record shows that Dr. Pollak continued treatment with the intent to hold off on the total knee arthroplasty as long as possible. (TR 286). The ALJ fully explained and gave good reasons for the weight he assigned to Dr. Pollak's opinion.

### 3.   *Whether The ALJ's RFC Is Supported By Substantial Evidence*

The ALJ found that Plaintiff has the RFC to perform light work including lifting and carrying 20 pounds occasionally and ten pounds frequently, standing and/or walking six hours of an eight-hour day, sitting six hours of an eight-hour day, allowing a sit/stand option and avoiding repetitive above-the-shoulder reaching. (TR 23). This RFC is equally or more restrictive than the exertional limitations set forth by Dr. Petersen or the agency medical consultant. (TR 125, 196). Even the twenty pound restriction is supported by Dr. Pollak's statement that Plaintiff can lift twenty pounds with each arm. (TR 295). The ALJ addressed Plaintiff's limitation from over the shoulder reaching and assigned a sit/stand option consistent with Plaintiff's knee impairments. (TR 295). The ALJ's RFC is supported by substantial evidence in the record.

### 4.   *Whether The ALJ Presented An Accurate Hypothetical Question To The Vocational Expert*

Finally, Plaintiff argues that the hypothetical question to the VE was inaccurate.  In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so.  *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993).  The ALJ presented all of the limitations of the RFC in his hypothetical question to the VE and the VE testified that such an individual would not be capable of performing Plaintiff's prior work, but that there are jobs available for a person with these limitations and cited the available jobs.  (TR 447-48).  The ALJ's decision that Plaintiff retained the RFC for a restricted range of light work is supported by substantial evidence and the ALJ properly relied on the VE's testimony to find that there are significant number of jobs available which Plaintiff can perform.

## VI.     CONCLUSION

The Commissioner's decision is supported by substantial evidence, was within the range of discretion allowed by law and there is insufficient evidence for the undersigned to find otherwise.  Accordingly, Defendant's Motion for Summary Judgment (docket no. 10) should be GRANTED, that of Plaintiff (docket no. 7) DENIED and the instant Complaint DISMISSED.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and

Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 11, 2010         s/ Mona K. Majzoub
                                MONA K. MAJZOUB
                                UNITED STATES MAGISTRATE JUDGE


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 11, 2010         s/ Lisa C. Bartlett
                                Case Manager